EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Luis E. Gervitz Carbonell<br>    Jorge Izquierdo San Miguel<br>    José G. Izquierdo Stella<br>    Francisco Troncoso<br>    Bufete Coale, Cooley & Lietz | 2004 TSPR 141<br><br> 162 DPR \_\_\_\_ |

Número del Caso: CP-1998-16


Fecha: 28 de julio de 2004


Oficina del Procurador General:
                        Lcdo. Carlos Lugo Fiol
                        Procurador General

                        Lcda. Edda Serrano Blasini
                        Subprocuradora General

                        Lcda. Ivonne Casanova Pelosi
                        Procuradora General Auxiliar


 Abogados de los querellados:

                        Lcdo. Luis Mariano Negrón Portillo
                        Lcdo. Virgilio Mainardi Peralta
                        Lcdo. Renato Barrios
                        Lcdo. Pedro E. Ortiz Alvarez
                        Lcdo. Luis E. Pabón-Roca
                        Lcda. Raquel Torres-Laureano
                        Lcdo. Guillermo Figueroa Prieto
                        Lcdo. Manuel Reyes Davila
                        Lcdo. Ramón Antonio Guzmán Rivera



Materia: Conducta Profesional
        (La suspensión será efectiva una vez advenga final y firme la Sentencia, conforme la Regla 45 del Reglamento del Tribunal Supremo sobre reconsideración.)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPEMO DE PUERTO RICO

In re

|  |  |  |
|---|---|---|
| Luis E. Gervitz Carbonell | | |
| Jorge Izquierdo San Miguel | CP-1998-16 | Conducta |
| José G. Izquierdo Stella | | Profesional |
| Francisco Troncoso | | |
| Bufete Coale, Cooley & Lietz | | |

PER CURIAM

San Juan, Puerto Rico, a 28 de julio de 2004.

I

El 4 de diciembre de 1996, el entonces presidente del Colegio de Abogados de Puerto Rico (en adelante, "el Colegio"), Lcdo. Fermín Arraiza, nos remitió copia de un comunicado de prensa que dicha institución circuló a los medios informativos del país. En el referido comunicado, el Colegio expresaba su preocupación por la alegada gestión de algunos abogados para procurarse clientes con el propósito de instar acciones en daños y perjuicios relacionadas con la explosión ocurrida en las

inmediaciones del Paseo de Diego en Río Piedras. Además, el comunicado advertía a la clase togada a "alejarse de todo lo que pueda parecer comercio con el dolor y la desventura del prójimo y evitar...que el ánimo de lucro sea una consideración de primer orden...."

Mediante Resolución de 12 de diciembre de 1996, este Tribunal ordenó al Procurador General investigar la conducta profesional desplegada por algunos abogados tras la explosión acaecida el 21 de noviembre de 1996. Además, se instruyó al Procurador General a examinar la razonabilidad y legalidad de los contratos de servicios legales suscritos por las víctimas y sus familiares; es decir, evaluar si éstos se otorgaron libre y voluntariamente, sin mediar un aprovechamiento indebido ante el dolor y la magnitud de la tragedia.

El 3 de septiembre de 1997, y tras la investigación de rigor, el Procurador General nos presentó su Informe. Éste señaló que la mayoría de los abogados que ostentan la representación legal de personas perjudicadas por el trágico evento no incurrió en irregularidad o conducta antiética en la contratación de sus clientes. No obstante, concluyó que varios abogados y un bufete legal incurrieron en conducta impropia. Entre los señalados estuvieron los querellados en este caso: Luis E. Gervitz Carbonell, Jorge Izquierdo San Miguel, José G. Izquierdo

Stella, Jorge Ortiz Brunet,[1] Francisco Troncoso y el bufete Coale, Cooley & Lietz.

Luego de darle oportunidad a los aquí querellados para que reaccionaran al Informe del Procurador General, ordenamos la presentación de la querella correspondiente.[2] El Procurador General presentó la Querella el 7 de diciembre de 1998. En ella se le imputa a los querellados el siguiente cargo:

> **[l]os abogados de epígrafe violentaron los principios establecidos por el Canon 34 de Ética Profesional el cual, entre otras cosas, obliga a todo abogado a abstenerse de ofrecer, sin ser requerido, su consejo o asesoramiento legal a clientes potenciales para iniciar reclamaciones judiciales, ya sea directa o a través de intermediarios.**

Los querellados respondieron al cargo imputado por separado, con excepción de los licenciados Izquierdo Stella e Izquierdo San Miguel, quienes comparecieron conjuntamente. Todos negaron haber incurrido en conducta impropia.

Mediante Resolución de 28 de abril de 1999, designamos al Lcdo. Enrique Rivera Santana como

---

[1] La acción disciplinaria que hoy atendemos incluía originalmente como parte querellada al Lcdo. Jorge Ortiz Brunet. No obstante, el 21 de mayo de 2002, se presentó ante nos una moción solicitando el sobreseimiento y archivo del asunto disciplinario respecto a éste, en vista de su fallecimiento el 20 de febrero de 2002. Mediante Resolución de 30 de mayo de 2003, ordenamos el archivo solicitado y la correspondiente enmienda del epígrafe para eliminar el nombre del Lcdo. Ortiz Brunet.

[2] Dicha orden se emitió mediante Resolución de 30 de octubre de 1998.

Comisionado Especial en el caso. A éste se le encomendó oír y recibir la prueba, y emitir un informe con sus conclusiones de hechos y recomendaciones pertinentes.

El 30 de noviembre de 1999, se celebró una conferencia sobre el estado del caso, a la cual comparecieron todas las partes. En esta conferencia, el Procurador General y el querellado Francisco Troncoso acordaron enmendar la querella en cuanto a éste último para eliminar el cargo por violación al Canon 34 y sustituirla por una al Canon 38 (sobre apariencia de conducta profesional impropia). Con este arreglo, el caso de este querellado quedó sometido. En cuanto a los demás querellados, se fijó un término para presentar el Informe sobre la conferencia celebrada, y se pautó una vista de seguimiento para el 16 de febrero de 2000.

En la vista de seguimiento, y tras las estipulaciones pertinentes, quedó sometido el caso de los querellados Izquierdo Stella e Izquierdo San Miguel. En cuanto al bufete Coale, Cooley & Lietz, se autorizó una enmienda a la querella para que se imputara adicionalmente el siguiente cargo:

> **[e]l bufete Coale, Cooley, Lietz...violentó los principios estatuidos por el Canon 36 de Ética Profesional, el cual, entre otras cosas, obliga al abogado a evitar en el proceso de anunciarse cualquier tipo de propaganda engañosa o falsa.**

Luego de aprobarse el Informe Enmendado, quedó sometido el caso contra ese bufete.

Finalmente, tras los acuerdos alcanzados en una vista celebrada el 10 de mayo de 2000, quedó sometido el caso contra el Lcdo. Gervitz Carbonell.

Una vez sometidos todos los casos, las partes convinieron no presentar a los testigos (los clientes) en la vista evidenciaria, optándose en su lugar por presentar las declaraciones juradas de éstos.[3] Se llegó a ese acuerdo ya que las partes consideraron que una vista evidenciaria podría resultar particularmente dañina para las personas que fuesen a declarar. Específicamente, las partes consideraron inapropiado entrar a cuestionar la credibilidad, o plantear contradicciones, de personas que ya habían sufrido suficiente a consecuencia de la tragedia que experimentaron.

Así las cosas, el 2 de noviembre de 2000, el Comisionado Especial rindió su Informe tomando en consideración "la totalidad de la amplia prueba documental a base de la cual las partes dejaron los casos sometidos, y ponderada también la prueba oral presentada en cuanto al querellado Gervitz Carbonell." Veamos a continuación los hechos específicos imputados a cada querellado, según lo informado por las partes, y las determinaciones fácticas del Comisionado Especial.

_____

[3] *Véase* Informe del Comisionado Especial, a la pág. 30. El único querellado que presentó prueba testifical fue el Lcdo. Gervitz Carbonell, pero la misma se limitó a su propio testimonio, el de su esposa y el de su secretaria.

II

## A. Lcdo. Luis E. Gervitz Carbonell

El 21 de noviembre de 1996, ocurrió una explosión en el edificio multipisos donde ubicaba la tienda Humberto Vidal, el cual estaba localizado en el área del Paseo de Diego en Río Piedras, Puerto Rico. Dicha explosión destruyó el mencionado edificio, además de causar decenas de muertos y serios daños a personas y edificios.

Entre las personas que fallecieron en la tragedia se encontró la señora Maritza Ramos Rivera, a quien se le dio cristiana sepultura el 24 de noviembre de 1996. La señora Ramos Rivera era hija de doña Justina Rivera del Moral.

El 25 de noviembre de 1996, en horas de la mañana, alguien (el Comisionado Especial expresó que la prueba presentada no le permitió establecer la identidad de la persona) se comunicó vía telefónica con la Sra. Rivera del Moral, identificándose como la esposa del Lcdo. Gervitz Carbonell, e indicándole a ésta que dicho abogado estaba en disposición de ayudarla. La señora Rivera del Moral le respondió que en esos momentos no estaba en gestiones de contratar abogado.

La prueba presentada evidenció que el Lcdo. Gervitz Carbonell no estuvo esa mañana en su oficina. No obstante, el Comisionado Especial determinó que la llamada telefónica en cuestión se originó desde la oficinas del Lcdo. Gervitz Cabonell, y que se dejó un

mensaje anotado para que el abogado se comunicara más tarde con la señora Rivera del Moral en relación con "el caso de [la] explosión." Dicha anotación se hizo en la libreta que servía de registro de llamadas del abogado. Sin embargo, no se pudo evidenciar quién tomó la llamada debido a que, según el querellado, la práctica de la oficina era la de no firmar al anotar los mensajes. Tampoco se preservó el registro, por lo que no estuvo disponible a la fecha de la vista evidenciaria.

El Comisionado Especial concluyó, además, que en la tarde del 25 de noviembre de 1996, la secretaria del Lcdo. Gervitz Carbonell pasó a éste las notas sobre las llamadas de la mañana, una de las cuales era la de la señora Rivera del Moral. La secretaria procedió a llamar a ésta última, comunicándola luego con el abogado. El Lcdo. Gervitz se identificó como vice-presidente del Colegio de Abogados—lo que efectivamente era para esa fecha—y se ofreció a ayudarle. Ella reiteró que no estaba interesada. En su declaración jurada, la señora Rivera de Moral indicó que durante la comunicación en cuestión el Lcdo. Gervitz Carbonell "no insistió en contratarla" para instar una acción de daños y perjuicios, y que ella no se sintió "presionada." Sin embargo, la señora Rivera del Moral declaró que sí inquirió al querellado sobre

cómo encontró su número de teléfono, a lo que el letrado no respondió.[4]

Luego de su comunicación con el Lcdo. Gervitz Carbonell, la señora Rivera del Moral le mencionó lo ocurrido a un familiar suyo, el Lcdo. Enrique Juliá. Éste le sugirió que hiciera una declaración jurada de lo ocurrido, ya que el Colegio de Abogados estaba investigando la conducta de algunos abogados en relación con la explosión de Río Piedras. La señora Rivera del Moral procedió de conformidad, y posteriormente, contrató a otro abogado para que la representara en su reclamación por los daños sufridos a causa de la muerte de su hija.

Para el 25 de noviembre de 1996, el bufete del Lcdo. Gervitz Carbonell— Gervitz & Barrios— ya tenía un contrato de servicios profesionales para representar a otro reclamante relacionado con la explosión, el señor Diano Fernández, a quien el querellado no conocía. Ese cliente obtuvo el número de teléfono del bufete a través de un vínculo que tenía con las Empresas Santana, cuyo presidente tenía, a su vez, buenas relaciones con el socio del querellado, el Lcdo. Renato Barrios. El Comisionado Especial concluyó que el bufete del Lcdo. Gervitz Carbonell obtuvo la representación del señor Fernández a través del Lcdo. Barrios.

---

[4] El Comisionado Especial expresó en su Informe que el teléfono aparecía listado en la guía telefónica a nombre de la hija fallecida, señora Maritza Ramos Rivera.

Mediante moción de 28 de noviembre de 2000, el Lcdo. Gervitz Carbonell ripostó al Informe del Comisionado Especial. Alegó que no existe prueba para concluir que la llamada a la señora Rivera del Moral se originara desde sus oficinas, mucho menos a instancias de él. Señaló también que durante la mañana del 25 de noviembre de 1996, ni él, su esposa, o su secretaria, estuvieron presentes en la oficina en horas de la mañana. Así, adujo que lo único que puede determinarse de la prueba desfilada es que, una vez él llegó a su oficina, llamó a la señora Rivera del Moral ya que, conforme a la libreta de mensajes, se le requería hacerlo.

## B. Lcdos. Izquierdo Stella e Izquierdo San Miguel[5]

### 1) Caso Maritza Ramos Rivera

La señora Maritza Ramos Rivera (véase relación de hechos del caso del Lcdo. Gervitz Carbonell) era esposa del señor Rafael Rodríguez y madre de las niñas Amy, Jocelyn y Kassandra Rodríguez Rivera. Los padres del señor Rodríguez, abuelos paternos de las hijas de la señora Ramos Rivera, son el señor Jorge Ayala y la señora Inarvis Aponte.

A raíz de la muerte de la señora Ramos Rivera, la señora Justina Rivera del Moral (madre de ésta) retuvo a las tres hijas de la finada (sus nietas). Ante la preocupación de que hubiese un reclamo por la custodia de

---

[5] En vista de que estos abogados contestaron la querella de manera conjunta, resolvemos los señalamientos en contra de éstos de igual manera.

las niñas de parte de la señora Rivera del Moral, doña Inarvis Aponte (madre del señor Rafael Rodríguez, quien es el padre de las niñas y viudo de la señora Ramos Rivera) se comunicó con el Lcdo. Izquierdo Stella, a quien conocía desde hace alrededor de veinte (20) años, para que fuera a la funeraria y la orientara.

El Lcdo. Izquierdo Stella— a quien la señora Inarvis Aponte se refiere en su declaración jurada como "Pincho"— visitó la funeraria y un día después se personó en la residencia de ésta.  El querellado Izquierdo Stella orientó a la señora Aponte y al señor Rafael Rodríguez sobre aspectos relacionados a la custodia de las niñas, así como sobre la posibilidad de entablar una demanda de daños y perjuicios por la muerte de la señora Ramos Rivera.  Tras la orientación, éstos autorizaron al Lcdo. Izquierdo Stella a presentar una acción de daños a nombre de toda la familia, y a representarlos en cualquier caso que se presentara relacionado con la custodia de las niñas.  El querellado se ofreció a llevar el caso de custodia *pro bono*.

Posteriormente, la señora Rivera del Moral presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una petición reclamando la custodia de sus tres nietas.[6]  El caso se tornó contencioso y los licenciados Izquierdo Stella e Izquierdo San Miguel asumieron la representación del padre de las niñas, el señor Rafael

---

[6] Caso Civil Núm. KCU 96-160.

Rodríguez. La señora Rivera del Moral estuvo representada por el Lcdo. Enrique Juliá.

Por razón de la relación surgida entre el Lcdo. Izquierdo Stella y la familia de doña Inarvis Aponte, el primero visita con frecuencia a estos clientes. Surge de autos que a veces juegan dominó, que el abogado le prestó a la familia una casa que posee en Cabo Rojo para que éstos pasaran un fin de semana, y que éste "le da la mano" en la transportación de las niñas a la escuela.

**2) Caso Omayra de León Flores**

En la explosión del edificio Humberto Vidal también falleció la señora Omayra de León Flores, hija de doña Ana Delia Flores y de don Eugenio de León. La occisa fue sepultada el 27 de noviembre de 1996.

Para la fecha de la tragedia, la señora Norma Sánchez se desempeñaba como funcionaria de orientación de la *Federal Emergency Management Agency* (en adelante, "FEMA"). A raíz de la explosión, ésta fue enviada por dicha agencia federal a la zona del desastre, para que ofreciera orientación y apoyo a los afectados por el evento. Se estipuló que la señora Sánchez— quien también fue destacada de la Cruz Roja Americana— conocía al Lcdo. Izquierdo Stella por muchos años.

Mientras desempeñaba sus labores de orientación en el área de la explosión, la señora Sánchez vino en contacto con la señora Janet de León, hermana de la finada Omayra de León. En la conversación, Janet le

expresó a la señora Sánchez la preocupación de sus padres respecto al futuro de su nieto (el hijo de la occisa, Omayra de León). Como resultado de la conversación, acordaron visitar a la señora Ana Delia Flores (madre de la finada y de Janet de León). Así pues, el 1 de diciembre de 1996, la señora Sánchez visitó la residencia de la señora Ana Delia Flores, acompañada del Lcdo. Izquierdo San Miguel.

Durante la conversación sostenida en la residencia de la señora Ana Delia Flores, el Lcdo. Izquierdo San Miguel pidió a ésta que suscribiera unos documentos que alegadamente eran necesarios para atender los asuntos de su nieto con ciertas agencias gubernamentales (Seguro Social y el Fondo del Seguro del Estado, entre otras). La señora Flores se rehusó al principio, pero ante la insistencia del Lcdo. Izquierdo San Miguel (quien le aseguró que era para poder ayudar a su nieto) ella accedió a firmar, sin examinar el documento. Sin embargo, el esposo de la señora Flores, señor Eugenio de León, se negó a firmar, por lo que su esposa firmó por él. No se le entregó a los firmantes en ese momento copia del documento.

Desde antes del entierro de su hija Omayra, sin embargo, el matrimonio de León-Flores había pedido al Lcdo. Carlos Mondríguez que los orientara en cuanto al futuro de su nieto (hijo de Omayra). Ese abogado accedió a entrevistarlos, y les dio una cita para el 7 de

diciembre de 1996. No obstante, el 6 de diciembre de 1996, los esposos de León-Flores recibieron en su residencia un sobre proveniente de las oficinas de los licenciados Izquierdo, el cual llevaron consigo el próximo día a la oficina del Lcdo. Mondríguez. Cuando éste examinó los documentos que obraban en el sobre, se percató de que se trataba de una copia de un contrato de servicios profesionales, y de una copia de una demanda de daños y perjuicios presentada por los licenciados Izquierdo a nombre de la señora Flores, su esposo y tres hijos de ese matrimonio. ***Ninguno de los demandantes había autorizado a que se presentara una demanda a su nombre***.

Posteriormente, durante la mañana del domingo 8 de diciembre de 1996, se presentaron los licenciados Izquierdo a la residencia de los esposos de León-Flores. De inmediato, el señor de León acusó a los abogados querellados de haber forzado a su esposa a firmar los documentos sin leerlos y sin haberle explicado que se trataba de un contrato de servicios profesionales. Les expresó, además, que ellos ya tenían abogado (el Lcdo. Mondríguez), replicando éstos que no había reparo en que éste se uniera a la representación legal. Asimismo, los licenciados Izquierdo le señalaron a los esposos de León-Flores que sólo habían ido a obsequiarles un libro. Éstos le reiteraron que no les interesaba que ellos los representaran.

Varios días después, el Lcdo. Mondríguez fue invitado al programa radial del periodista Luis Francisco Ojeda. En el mismo, se dialogó sobre la conducta de algunos abogados relacionada a la gestión de allegarse clientes afectados por la tragedia de Río Piedras. El día después a la transmisión de ese programa radial, el Lcdo. Izquierdo Stella se trasladó hasta el lugar de trabajo del señor de León, y le solicitó que firmara una carta que llevaba preparada. El señor de León se negó a firmarla, a lo que el Lcdo. Izquierdo Stella contestó que entonces iba a tener que suicidarse.

Luego de ese incidente, los esposos de León-Flores recibieron varias llamadas del Lcdo. Izquierdo Stella, urgiéndolos a que firmaran otros documentos. Surge del Informe del Comisionado Especial que dichos documentos no están entre los estipulados, y que tampoco fueron unidos en autos.

### 3) Caso Claudia Pabón

Otra de las víctimas de la explosión de Río Piedras fue la señora Claudia Pabón, quien a la fecha de la tragedia estaba casada con el señor Miguel Carrillo Rosado. Mientras el cuerpo de su difunta esposa era "velado" en la funeraria, el señor Carrillo recibió la visita del Lcdo. Eduardo González, quien le ofreció los servicios legales del bufete de los licenciados Izquierdo. El señor Carrillo expresó que, al momento de la visita, desconocía quién le había suministrado su

nombre a dicho bufete, cosa que el Lcdo. González tampoco le explicó.[7]

No obstante, el señor Carrillo aceptó ser orientado por el bufete del Lcdo. Izquierdo Stella. Dicha orientación se llevó a cabo, según el señor Carrillo, en la "residencia del Lcdo. Pincho Izquierdo," a donde acudió acompañado de su cuñado y otros familiares. Expresó que no fue presionado para que contratara con el bufete de éste, y que, de hecho, escogieron a otro abogado (Lcdo. Francisco Troncoso) para que los representara.

### 4)   Caso Lourdes Yadira Ocasio

La señora Lourdes Yadira Ocasio fue otra de las personas que perdió la vida a consecuencia de la explosión ocurrida en el Paseo De Diego. Ésta era esposa del señor Julio César Suárez García.

El señor Suárez García advino en contacto con el bufete de los licenciados Izquierdo a través de la señora Norma Sánchez, la empleada de FEMA a la cual nos referimos en el inciso 2 de esta sección. La recomendación vino a través de la madre del señor Suárez García, quien tras ser orientada por la señora Sánchez le expresó a ésta que "trajera al Lcdo. Izquierdo a su

---

[7] Posteriormente, el señor Carrillo se retractó y señaló mediante declaración jurada que advino en contacto con ese bufete a través de su amigo, el señor Ángel O'Neill. Este último le ofreció al señor Carrillo hablarle de su caso al Lcdo. Izquierdo Stella, a lo que éste accedió.

casa." Así pues, el Lcdo. Izquierdo San Miguel y la señora Sánchez acudieron a la residencia de los padres del señor Suárez. Allí, el Lcdo. Izquierdo San Miguel y el señor Suárez dialogaron sobre el caso, acordando presentar una demanda en daños y perjuicios. El señor Suárez expresó mediante declaración jurada que se siente muy satisfecho con la representación que los licenciados Izquierdo le han ofrecido.

### 5) Caso Evelyn Fernández

Aproximadamente tres semanas luego de la tragedia, el Lcdo. Izquierdo San Miguel visitó el hogar de la señora Evelyn Fernández, quien perdió en la explosión de Río Piedras a su tía, la señora María Llanos Canales. De acuerdo a las declaraciones de la señora Fernández, el Lcdo. Izquierdo San Miguel se presentó en su casa indicando que la Cruz Roja le había entregado una lista de clientes potenciales relacionados con la explosión. La señora Fernández, sin embargo, le expresó al abogado que no estaba interesada en sus servicios. El Informe del Comisionado Especial concluyó que, ante la negativa de ésta, el querellado se marchó de su residencia y no regresó.

De otra parte, la señora Fernández señaló en su declaración jurada que la señora Norma Sánchez visitó la residencia de su madre, hermana de la occisa, y que en dicha ocasión ésta fue acompañada de su esposo y de un trabajador social. En esa conversación, la señora

Sánchez recomendó los servicios de los licenciados Izquierdo.

A raíz de los cinco casos relatados en esta sección, el 19 de abril de 2000, se presentó ante nos un escrito titulado *Informe Conjunto del Procurador General y de los Querellados José Izquierdo Stella y Jorge Izquierdo San Miguel*. En dicho Informe, los querellados aceptaron que "en el curso de la contratación con algunos clientes pudieron haber hecho expresiones que fueron interpretadas negativamente por personas y de alguna forma afectaron la percepción del proceso." A tenor de ello, se allanaron a una censura de parte de este Tribunal.

### C.   Lcdo. Francisco Troncoso

Según la prueba estipulada por las partes, el Lcdo. Francisco Troncoso es un abogado de vasta experiencia en casos de "grandes desastres." Se estipuló también que este querellado representó a varios reclamantes en el caso del Hotel Dupont Plaza, y que fue designado como miembro del Comité Timón de abogados que estableció el Tribunal de Estados Unidos para el Distrito de Puerto Rico, para coordinar las reclamaciones que se instaron en dicho foro a consecuencia del fuego ocurrido en esa hospedería. Además, se estipuló que la participación del Lcdo. Troncoso en ese litigio fue objeto de cobertura en los medios noticiosos del país.

El Comisionado Especial concluyó que, luego de la aludida explosión del 21 de noviembre de 1996, varios

periodistas que conocían al Lcdo. Troncoso se comunicaron con él, a propósito de que opinara sobre el litigio que podía surgir como consecuencia de la tragedia. Su opinión fue, en efecto, utilizada por varios periodistas en sus reportajes, y su nombre fue citado como abogado de experiencia en esa clase de litigio. Así, por ejemplo, el periódico *The San Juan Star*, en su edición de 22 de noviembre de 1996, singularizó al querellado como miembro del comité timón en el caso de Dupont Plaza. *El Nuevo Día*, en su edición de 23 de noviembre de 1996, también se refirió a éste como abogado con experiencia en el caso del Dupont Plaza. *El Vocero*, por su parte, informó el 25 de noviembre de 1996, que los licenciados Troncoso, Ortiz Brunet y Wendell Gautier preparaban reclamaciones millonarias por daños y que ya, tres días antes, el Lcdo. Ortiz Brunet había presentado la primera demanda.

En cuanto a los medios televisivos, el 25 de noviembre de 1996, los noticiarios de los canales 4, 6 y 11 dieron constancia de la presencia de los licenciados Troncoso y Ortiz Brunet en la escena de la explosión, aclarándose que el Superintendente de la Policía, Lcdo. Pedro Toledo Dávila, no les permitió entrar. Surge del expediente, además, que el Lcdo. Troncoso fue invitado, junto al Lcdo. Ortiz Brunet, al programa de televisión "Al Grano", que produce el señor Pedro Zervigón, y que se transmitió el 1 de diciembre de 1996. En dicho programa, al enfrentársele con la alegada insensibilidad de los

abogados por estar presentando demandas cuando aún se estaban rescatando cadáveres, éste, además de expresarse sobre los términos prescriptivos de las acciones torticeras, hizo mención de que a las víctimas no se les permite estar presentes en la investigación que llevaban a cabo las autoridades federales y estatales. Adujo que, por ello, existía la necesidad de formar un equipo de abogados que estuviesen dispuestos a involucrarse de lleno en el caso. Al inquirírsele sobre cómo se sentía sobre las críticas que se le hacía por la premura en presentar demandas, éste destacó que los Cánones de Ética Profesional le imponen al abogado la responsabilidad de ser diligente, y que ello en este caso suponía que no se quedara sentado esperando que las autoridades pertinentes terminaran su informe.

Finalmente, las partes estipularon que cuando comenzó la exposición noticiosa del Lcdo. Troncoso, ya éste ostentaba la representación legal de varios clientes. Además, se estipuló que varios abogados refirieron clientes al Lcdo. Troncoso, entre estos: Lcdo. Leroy Lewis, Lcdo. Elí B. Arroyo, Lcdo. José A. Acosta Grubb, Lcdo. Enrique Rebollo Portela, Lcdo. Arnaldo L. Fernandini, Lcdo. Iván Durant Sierra, Lcdo. Josué Rodríguez y Lcdo. Luis R. Santini Gaudier.

Como resultado de los hechos y estipulaciones precedentes, las partes acordaron enmendar la querella contra este abogado para que el cargo fuese por violación

al Canon 38 de Ética Profesional (apariencia de conducta impropia) en lugar del formulado originalmente (Canon 34). Posteriormente, el Lcdo. Troncoso compareció para alegar la vaguedad del término "apariencia de conducta impropia" y la consiguiente imposibilidad de que se le sancione a base de ese estándar.

### D. Bufete Coale, Cooley & Lietz

El bufete querellado tiene su sede en Washington, D.C., Estados Unidos de América, y se especializa en litigación compleja, incluyendo casos de accidentes de aviación y de daños a gran escala ("mass torts").[8] Según el Informe del Comisionado Especial, conforme al *Martindale-Hubble Directory*, edición de 1996, este bufete está clasificado con un "Legal Ability Rating" de "A".[9]

A raíz de la tragedia ocurrida en Río Piedras, el bufete querellado preparó una carta para las familias

---

[8] Este bufete operaba originalmente bajo el nombre de Coale & Van Sustern. Posteriormente cambió su nombre a Coale, Cooley, Lietz McInery Broadus, siendo esta firma la sucesora de la otra para todos los efectos legales.

[9] Los índices del directorio de Martindale-Hubble clasifican a los bufetes como: "A" (from Very High to Preeminent), "B" (from High to Very High), "C" (from Fair to High). Según dicho directorio, las clasificaciones se basan en:

> the standard of ability for the place or area where the lawyer practices, it also takes into consideration experience, nature of practice and qualifications relevant to the profession. Where a lawyer's practice is limited or specialized, rating opinions are made on the basis of performance in those Fields of Law. There are no minimum periods of time required for any rating.

afectadas.   La carta se redactó originalmente en el

idioma inglés, pero fue traducida al español mediante un

programa de computadoras con el siguiente texto:[10]

Querida familia superviviente:

Nuestro más sentido pésame por la pérdida que sufrió su familia como resultado de la explosión de gas Enron.

Somos un bufete nacional e internacional con base en los Estados Unidos, con sede en Washington, D.C., y una de las firmas más prestigiosas para casos de incendios y explosiones. Como tal, estamos en una situación privilegiada para poder proporcionarle una excelente representación legal, y la máxima compensación posible.

Si bien muchos bufetes de los Estados Unidos y Puerto Rico participaron en el último desastre de tal magnitud en Puerto Rico (el incendio del Hotel Dupont Plaza), fuimos nosotros el único bufete que en última instancia llevó el caso a juicio. Sería un honor tener la oportunidad de hacer lo mismo por usted.

Las leyes estatales conocidas como leyes de homicidio culposo y daños personales conceden a las víctimas dañadas y las familias supervivientes el derecho a una indemnización económica. Usamos estas leyes para su beneficio, para maximizar su reclamación.

Mientras que muchos bufetes afirman que pueden manejar su caso, muy pocos tienen el tiempo y los recursos financieros para llevar un caso como éste hasta sus últimas consecuencias--para maximizar la reclamación económica y para dejar claro el mensaje a Enron de que la negligencia no se tolerará bajo circunstancia alguna.

Esta ha sido una terrible tragedia, y algo que podría haberse evitado.   No

_____

[10] La carta tenía fecha de 30 de noviembre de 1996.

podemos hacer nada para cambiar los acontecimientos que han tenido como resultado su pérdida y la de sus seres queridos. Lo que podemos hacer es proporcionar una seguridad financiera definitiva para su familia.

Esta carta fue entregada personalmente a algunas personas afectadas por el evento trágico de Río Piedras. La entrega la efectuó el señor Ted Dickinson y la señora Ricci Marcano, a nombre del bufete querellado. En ocasiones, la entrega de la carta fue acompañada de flores y dulces. Ningún abogado del bufete— ni ningún otro abogado —participó de la entrega de la referida carta.

De acuerdo con el Informe del Comisionado Especial, el único caso relacionado con la tragedia en que el bufete asumió la representación legal fue en el de la señora Yolanda Santiago Hernández.[11] Posteriormente, cuando dicho bufete se enteró de que la señora Santiago Hernández le había informado al Procurador General que contrató a Coale, Cooley & Lietz porque éstos "insistían en visitarle", le remitió una carta a ésta indicándole que no podía continuar representándola, y la orientó para que gestionara nueva representación legal. La señora Santiago Hernández contestó a dicha misiva urgiéndole al

_____

[11] El caso fue presentado ante el Tribunal de Estados Unidos para el Distrito de Puerto Rico, bajo el epígrafe *Yolanda Santiago Hernández v. Enron*, 96-2561CCC. A la señora Santiago Hernández se le identifica en el Informe del Procurador General como la abuela del menor Bryan Santiago, quien recibió gran exposición en la prensa debido a su corta edad y a los daños que sufrió.

bufete que continuara representándola, e indicándole que se sentía complacida y satisfecha con los servicios que le habían prestado.

### E. Observaciones del Comisionado Especial

Tras relacionar lo hechos pertinentes a cada querellado, el Comisionado Especial señaló que la conducta profesional de los querellados bordea, en algunos casos, la frontera entre la violación ética y la protección constitucional a la libertad de expresión.

En cuanto a los licenciados Izquierdo Stella e Izquierdo San Miguel, el señor Comisionado Especial apuntó a que los dos querellados se beneficiaron de una relación de amistad que tenían con una funcionaria de FEMA que laboraba ofreciendo orientación a las víctimas de la tragedia. Además, señaló como particularmente problemático el caso de la finada Omayra de León Flores, en el cual los querellados indujeron dolosamente a la madre de ésta, la señora Ana Delia Flores, a firmar un documento que resultó ser un contrato de servicios profesionales y que ella entendía que tenía un propósito distinto.

En cuanto al Lcdo. Francisco Troncoso, el Comisionado Especial se limita a repasar los hechos imputados a éste, para luego concluir sucintamente que "excepto por la participación en la conferencia de prensa que se ofreció en la tarde del 25 de noviembre de 1996, en las demás referencias noticiosas en las que se alude

al Lcdo. Troncoso no surge que la información emanara por iniciativa del abogado."

El Informe del Comisionado Especial no hace observaciones sobre los restantes querellados.[12] Tampoco recomienda qué tipo de sanción, si alguna, debe ser aplicada a los querellados.

Recibido el Informe del Comisionado Especial, evaluada la prueba documental, y teniendo todos los elementos de juicio para resolver, procedemos a así hacerlo.

III

En repetidas ocasiones hemos establecido que todo asunto relacionado con la reglamentación del ejercicio de la profesión legal— como la admisión o la separación de sus miembros— es facultad inherente de este Tribunal. *In re Peña Peña*, res. el 27 de marzo de 2001, 153 D.P.R. ___, 2001 T.S.P.R. 49, 2001 J.T.S. 48.; *In re Freytes Mont*, 117 D.P.R 11 (1986); *In re Liceaga* 82 D.P.R. 252 (1961). Cuando ha sido necesario, hemos ejecutado tal autoridad para separar del ejercicio de la profesión legal a aquellos abogados que no se desempeñan conforme a las rigurosas normas de conducta que rigen su quehacer profesional.

---

[12] El Informe también hace observaciones en cuanto al querellado Jorge Ortiz Brunet, quien ya no es parte en este caso por razón de su fallecimiento. *Véase* escolio 1, *supra*.

Como regla general, los Cánones de Ética Profesional establecen las pautas mínimas que deben guiar a los miembros de la clase togada en el ejercicio de su delicada faena. *In re Ortiz Brunet*, res. el 22 de noviembre de 2000, 152 D.P.R. ___ (2000), 2000 T.S.P.R. 170, 2000 J.T.S. 182.; *In re Filardi Guzmán*, 144 D.P.R. 710 (1998). Su finalidad es promover un desempeño profesional y personal acorde con los más altos principios de conducta decorosa, ello para beneficio tanto de la profesión como de la ciudadanía y las instituciones de justicia del país. *In re Ortiz Brunet*, *supra*.

En el caso de marras, se le imputa a los querellados haber incurrido en conducta violatoria de varios de estos cánones. Delineamos, pues, el estado de Derecho vigente en relación con los cargos imputados.

El Canon 34 de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 34, dispone en lo pertinente que:

> Actúa contrario a los altos postulados de la profesión el abogado que, con propósito de lucro y sin ser requerido para que ofrezca su consejo o asesoramiento legal, aliente o estimule, en alguna forma, a clientes potenciales para que inicien reclamaciones judiciales o de cualquier otra índole. Es también contrario a la sana práctica de la profesión el que un abogado, sin ser requerido, bien lo haga personalmente o a través de personas, investigue o rebusque defectos en títulos u otras posibles fuentes o causas de reclamaciones a los fines de beneficiarse en alguna forma mediante la prestación de sus servicios profesionales.

> ***Empaña la integridad y el prestigio
> de la profesión y es altamente reprobable
> el que un abogado, actuando directamente
> o a través de intermediarios o agentes,
> haga gestiones para proporcionarse casos
> o reclamaciones en que intervenir o para
> proporcionarlos a otros abogados.*** Incurre
> en igual falta el abogado que dé u
> ofrezca beneficios, favores o
> compensación de clase alguna a empleados
> públicos, ajustadores de seguros u otras
> terceras personas con el fin de ganarse
> su favor para el referimiento de asuntos
> que puedan dar base a reclamaciones o
> casos y, por ende, proporcionarle al
> abogado aumento en su
> clientela...(énfasis suplido).

Como se puede observar, el citado Canon tiene como propósito prohibir la solicitación de clientes de forma personal o a través de intermediarios. La adopción del mismo responde, de una parte, a la histórica animadversión de la profesión legal hacia la conducta de abogados que instigan pleitos judiciales a base de un interés puramente pecuniario. Asimismo, responde a la repulsión que generan las actuaciones de abogados enfocadas en gestionar la contratación de clientes en momentos en que éstos se encuentran en una situación angustiosa o apesadumbrada. *Véase In re Ortiz Brunet*, *supra*.

De otra parte, inspira al texto de este Canon la idea de que la contratación de representación legal debe darse de forma libre, inteligente y voluntaria, sin que medien persuasiones o presiones directas e indebidas de parte del abogado. *Véase In re Izquierdo Stella*, res. el 2 de agosto de 2001, 154 D.P.R. ___ (2001), 2001 T.S.P.R.

113, 2001 J.T.S. 116. Dado que la contratación debe surgir del genuino convencimiento del cliente de que su reclamación será atendida diligentemente por el abogado que seleccionó, el Canon repudia la representación legal obtenida mediante falsas representaciones, medias verdades y engaños. *In re Franco Rivera y Masini Soler*, 134 D.P.R. 823 (1993).

La normativa que precede, sin embargo, tiene que aplicarse a la luz de los pronunciamientos constitucionales que sobre el asunto ha emitido la Corte Suprema de Estados Unidos. Desde *Bates v. State Bar of Arizona*, 433 U.S. 350 (1976), los anuncios publicitarios de abogados que no sean falsos, engañosos o que induzcan a error, están protegidos por la Primera Enmienda de la Constitución Federal, ya que se considera "expresión comercial."[13] No obstante, en *Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (1978), ese alto foro resolvió que una entidad estatal encargada de reglamentar la profesión legal puede, constitucionalmente, disciplinar a un abogado que **solicita personalmente** la representación legal de un cliente potencial.

Posteriormente, la Corte resolvió el caso de *Shapero v. Kentucky Bar Association*, 486 U.S. 466 (1987), en el cual estableció, al amparo de la Primera Enmienda, la

---

[13] Sobre la "expresión comercial", véase *Central Hudson Gas & Electric Corp. v. Public Service Comm.,* 447 U.S. 557 (1980); *Va. Pharmacy Board v. Va. Consumer Council* 425 U.S. 748 (1976).

validez de las cartas de solicitación no-engañosas a personas específicas que el abogado sabe que tienen una potencial reclamación judicial ("targeted mailing").  Al distinguir la situación ante su atención de la solicitación personal vedada en *Ohralik*, *supra*, la Corte Suprema se expresó en los siguientes términos:

> [l]ike print advertising, petitioner's letter— and targeted, direct-mail solicitation generally— poses much less risk of overreaching or undue influence than does in person solicitation.  Neither mode of written communication involves the coercive force of the personal presence of a trained advocate, or the pressure on the potential client for an immediate yes-or-no answer to the offer of representation.  Unlike the potential client with a badgering advocate breathing down his neck, the recipient of a letter and the reader of an advertisement...can effectively avoid further bombardement of his sensibilities simply by averting his eyes.  A letter, like a printed advertisement (but unlike a lawyer), can readily be put in a drawer to be considered later, ignored, or discarded. *Shapero v. Kentucky Bar Association*, supra, a la pág. 475-476.(citas omitidas y énfasis suplido).

La jurisprudencia citada nos obliga por imperativo de la Primera Enmienda, ya que cuando se trata de derechos fundamentales, en nuestra jurisdicción tenemos que observar las garantías mínimas reconocidas bajo la Constitución de Estados Unidos. *López Vives v. Policía de Puerto Rico*, 118 D.P.R. 219 (1987).  Por tanto, bajo el Canon 34 de Ética Profesional, la solicitación a

personas específicas mediante cartas no-engañosas está permitida constitucionalmente. La solicitación personal,[14] por el contrario, no está permitida porque constituye una intromisión con la intimidad de la persona, y una presión indebida en el proceso de selección de abogado, que debe ser inteligente, libre y voluntario.

Por otro lado, el Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 38, dispone en lo pertinente que:

> [e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia....

En *In re Ortiz Brunet*, *supra*, a la pág. 7, expresamos que cada abogado es un espejo en el que se refleja la imagen de la profesión. Ello así toda vez que, sus actuaciones manifiestan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular, sino también de la clase togada en general. Por ello, resolvimos en ese caso que la "inmediatez de la presencia de los abogados...en momentos de indudable angustia de los familiares de una víctima,

---

[14] Se ha reconocido, además, como "contacto personal" la llamada telefónica no grabada. Regla Modelo 7.3 de la American Bar Association (ABA). Dicha Regla Modelo, según revisada por la Comisión *Ethics 2000*, se refiere también a la comunicación electrónica en vivo ("Chats") como una forma de contacto personal prohibido.

siembra serias dudas sobre la conducta profesional de los miembros de la profesión."

Asimismo, en *In re Izquierdo Stella*, *supra*, a la pág. 7, expresamos que es responsabilidad de los abogados examinar con rigor y prudencia los escenarios en los que pudieran desenvolverse, de forma tal que eviten incurrir, o aparentar que incurren, en conducta éticamente censurable y nociva a la dignidad y honor de la profesión.

Finalmente, en cuanto a las penalidades correspondientes a un abogado que incurre en conducta impropia, hemos establecido que en la determinación de la sanción aplicable, este Tribunal tomará en consideración factores tales como el previo historial del abogado, si se tratare de una primera falta o de una conducta aislada, y si el abogado goza de buena reputación en la comunidad. *In re Vera Vélez*, res. el 14 de octubre de 2003, 160 D.P.R. ___ (2003); 2003 T.S.P.R. 169; 2003 J.T.S. 60; *In re Rivera Arvelo y Ortiz Velásquez*, 132 D.P.R. 840 (1993).

A base del estado de Derecho delineado en esta sección, resolvemos.

IV

**A. Lcdo. Luis E. Gervitz Carbonell**

El Comisionado Especial encontró probado que durante la mañana del 25 de noviembre de 1996, alguien se comunicó con la señora Justina Rivera del Moral, madre de

la finada Maritza Ramos Rivera, para ofrecerle los servicios del Lcdo. Luis E. Gervitz Carbonell. Dicha comunicación, determinó el Comisionado Especial, no fue solicitada, gestionada o aprobada con anterioridad por la recipiente de la misma. Asimismo, dicho funcionario concluyó que, a pesar de que la identidad de la persona que hizo la llamada no pudo determinarse, ésta se originó desde las oficinas del Lcdo. Gervitz Carbonell.

El querellado, por su parte, alegó que no hay prueba para concluir que la llamada realizada esa mañana se realizó desde su oficina, o que la realizara su esposa, su secretaria o él personalmente. Sin embargo, aceptó que llamó a la señora Rivera del Moral durante la tarde porque, conforme a la libreta de mensajes, se le requería hacerlo. Por tanto, entiende que no debe disciplinársele por el cargo imputado. No nos persuade el argumento del querellado.

De acuerdo a la prueba desfilada, el querellado Gervitz Carbonell se comunicó telefónicamente con la señora Rivera del Moral sin que ésta se lo requiriese. Aunque el querellado arguye que ni él, ni su esposa, ni su secretaria realizaron la llamada, ***éste no presentó evidencia de que la llamada no se originara desde su oficina, para así rebatir lo expresado por la señora Rivera del Moral en su declaración jurada***. Por ejemplo, el querellado no presentó la libreta en la que alegadamente se encontraba el mensaje de la señora Rivera

del Moral. Nótese, además, que el Comisionado Especial determinó que la señora Rivera del Moral le inquirió al Lcdo. Gervitz Carbonell sobre cómo había conseguido su número telefónico, lo que refuerza la conclusión de que ésta no inició el diálogo con el abogado. En consecuencia, no habiendo prueba alguna que demuestre que el primer contacto lo realizó la señora Rivera del Moral, es forzoso concluir que el contacto telefónico original fue a iniciativa del abogado querellado.

Por tanto, existe prueba clara, robusta y convincente[15] para concluir que el Lcdo. Gervitz Carbonell violó el Canon 34 de Ética Profesional al contactar directamente, mediante comunicación telefónica, a una cliente potencial sin que ésta se lo requiriera.

En vista de que el Lcdo. Gervitz Carbonell goza de buena reputación tanto en la comunidad jurídica como en la comunidad en general, y que no ha sido objeto de querella ni de acción civil alguna relacionada con la práctica en los 18 años que ha ejercido como abogado,[16] limitamos su sanción a una censura enérgica, apercibiéndolo de que futuras violaciones a los deberes éticos de la profesión acarrearán sanciones más severas.

---

[15] *Véase In re Caratini Alvarado*, res. el 9 de marzo de 2001, 153 D.P.R. ___ (2001), 2001 T.S.P.R. 46, 2001 J.T.S. 45.

[16] *Véase* Informe del Comisionado Especial, a la pág. 10.

**B. Lcdo. Izquierdo Stella e Izquierdo San Miguel**

Entre los actos imputados a los licenciados Izquierdo, nos llama particularmente la atención aquéllos relacionados al caso de la finada Omayra de León Flores. Surge de autos que éstos advinieron en contacto con los prospectivos clientes— el señor Eugenio de León y la señora Ana Delia Flores, padres de la difunta— a través de la señora Norma Sánchez (empleada de FEMA). Esta última tuvo conocimiento de la situación al advenir en contacto con la hermana de la finada, la señora Janet de León, quien le comunicó la preocupación de sus padres ***en relación con el futuro de su nieto***. Según el Informe del Comisionado Especial, la señora Sánchez y Janet de León acordaron visitar a los padres de la segunda. Además, se determinó que la señora Sánchez recomendó al Lcdo. Izquierdo Stella para que colaborara con los asuntos legales. ***Nótese, sin embargo, que los servicios de los querellados no fueron requeridos por los prospectivos clientes con anterioridad a la visita, como tampoco se habló de la presentación de un caso en daños y perjuicios***.

No obstante, el 1 de diciembre de 1996, la señora Sánchez y el Lcdo. Izquierdo San Miguel acudieron a la residencia de los esposos de León-Flores.[17] En dicha reunión, el Lcdo. Izquierdo San Miguel logró de manera

---

[17] No surge del expediente si la señora Janet de León estuvo presente en la reunión.

dolosa que los padres de la finada firmaran un contrato de servicios profesionales, al amparo del cual, posteriormente, presentó junto al Lcdo. Izquierdo Stella una demanda de daños y perjuicios a nombre de éstos. Ello provocó malestar en los señores de León-Flores, quienes le comunicaron en una segunda visita[18] que no habían autorizado dicho curso de acción, y les informaron a los querellados que ya tenían abogado, el Lcdo. Carlos Mondríguez.

Como si fuera poco, al complicarse el asunto debido a que el Lcdo. Mondríguez acudió a los medios a denunciar la conducta de algunos abogados en relación con el caso de la explosión de Río Piedras, el Lcdo. Izquierdo Stella se trasladó al lugar de trabajo del señor de León para que le firmara unos documentos no identificados. Peor aún, al éste negarse a firmarlos, el Lcdo. Izquierdo Stella le advirtió que entonces tendría que suicidarse.

Indudablemente, los hechos relatados ilustran una conducta inaceptable y violatoria del Canon 34 de Ética Profesional. Como se puede observar, gracias a las gestiones de su intermediaria en el lugar de los hechos— la señora Norma Sánchez— los licenciados Izquierdo tuvieron acceso personal a unos clientes potenciales, sin que éstos requiriesen de sus servicios. De hecho, el matrimonio de León-Flores ya había gestionado una cita

_____

[18] En esta segunda visita estuvieron presentes ambos querellados, el Lcdo. Izquierdo Stella y el Lcdo. Izquierdo San Miguel.

con otro abogado, lo que abona a la conclusión de que la reunión no se concertó a instancias de éstos.

Asimismo, la conducta del Lcdo. Izquierdo San Miguel de instar dolosamente (explicándole que era por el bien de su nieto) a la señora Flores a firmar unos documentos que resultaron ser un contrato de servicios, y la posterior presentación de la demanda sin el consentimiento de los señores de León-Flores, infringe las normas más elementales en contra de la solicitación de clientes. Igualmente, la visita del Lcdo. Izquierdo Stella al lugar de trabajo del señor de León, amenazándolo con suicidarse si no le firmaba ciertos documentos, representa, cuando menos, una conducta indigna de la profesión.

En cuanto a los restantes señalamientos, resolvemos que el caso de la señora Evelyn Fernández también ilustra una violación al Canon 34 de Ética Profesional. Ello así toda vez que, según estipularon las partes, la visita del Lcdo. Izquierdo San Miguel a la residencia de ésta no se dio a solicitud de ella.[19] Igualmente, la explicación ofrecida por el Lcdo. Izquierdo San Miguel para justificar su presencia en la residencia de la afectada (que la Cruz Roja le facilitó un listado de potenciales clientes) fue deshonesta, engañosa y conducente a error.

---

[19] Véase *Informe Conjunto del Procurador General y de los Querellados José Izquierdo Stella y Jorge Izquierdo San Miguel*, a la pág. 5.

*Véase In re Franco Rivera y Masini Soler*, 134 D.P.R. 823 (1993).[20]

Por los hechos antes detallados, los querellados se allanan a que se les censure enérgicamente.  No estamos de acuerdo.

Según se puede apreciar, los hechos imputados a los licenciados Izquierdo no fueron unos aislados y desconectados.  Por el contrario, se puede palpar el carácter sistemático de su conducta y la consistencia de su *modus operandi*.  Ello nos obliga a concluir que la conducta exhibida no se debió a descuido, falta de circunspección o de vaguedad en el lenguaje, sino más bien a designio y premeditación.

A modo ilustrativo, es difícil obviar que el método utilizado por el Lcdo. Izquierdo Stella en los hechos aquí mencionados es similar al que empleó en aquellos que le valieron una censura severa de este Tribunal hace varios meses atrás. *Véase In re Izquierdo Stella*, *supra*. En vista de este historial, lo suspendemos por un período de tres (3) meses del ejercicio de la abogacía y la notaría.

En cuanto al Lcdo. Izquierdo San Miguel, a pesar de que no tiene un historial de conducta antiética ante este Tribunal, la magnitud y seriedad de los cargos que se le

---

[20] En cuanto a los restantes señalamientos, de la prueba disponible y del Informe del Comisionado Especial, se puede concluir que los contactos establecidos por los Lcdos. Izquierdo se llevaron a cabo con la anuencia de los clientes potenciales.

probaron en este caso ameritan algo más que una censura. Por tanto, lo suspendemos por un período de treinta (30) días de ejercicio de la abogacía y la notaría.

Le imponemos a los querellados el deber de notificar a todos sus clientes de su presente inhabilidad de continuar representándolos durante el período de la suspensión. Además, deberán devolver cualesquiera honorarios recibidos por trabajos no realizados, e informar oportunamente de su suspensión a los foros judiciales y administrativos del país.

### C. Lcdo. Francisco Troncoso

El Procurador General señala que el Lcdo. Troncoso incurrió en conducta violatoria del Canon 38 de Ética Profesional al presentarse en diferentes medios de comunicación expresándose, en carácter de abogado experto, sobre temas relacionados a la explosión de Río Piedras. Sostiene el Procurador General que, al comenzar a proyectarse en los medios noticiosos desde fecha tan temprana como el día después de la tragedia, el querellado dio la impresión ante el público de que se estaba promocionando para reclutar clientes entre las víctimas de la tragedia. Más aún, indica el Procurador General que el Lcdo. Troncoso sabía, o debió saber, que ello podría ser interpretado como falta de sensibilidad que afectaría la imagen de la profesión legal. No estamos de acuerdo.

Según las conclusiones del Comisionado Especial, los contactos del Lcdo. Troncoso con la prensa fueron a iniciativa de los propios periodistas, quienes por conocer de la participación de éste en el litigio relacionado con el desastre del Dupont Plaza, le solicitaron su opinión sobre la tragedia de Río Piedras.

En cuanto a la participación del querellado en el programa televisivo "Al Grano", el Comisionado Especial determinó que ésta respondió a una invitación del señor Pedro Zervigón. Además, que las referencias que hizo el Lcdo. Troncoso ante los medios sobre su participación en el litigio del Dupont Plaza, y sobre su experiencia en casos de daños a gran escala, no fueron falsas ni engañosas. Por tanto, concluyó que como información veraz, está protegida por las garantías de libertad de expresión contenidas en la Constitución de Estados Unidos y en la Constitución de Puerto Rico. Adoptamos la conclusión del Comisionado Especial al respecto.

Habida cuenta de que bajo el estado de derecho vigente, el Lcdo. Troncoso podía dirigirse mediante correo no engañoso a las víctimas conocidas de la explosión desde el primer día de los hechos, *Shapero, supra*, y podía anunciarse en radio, prensa escrita y televisión con un mensaje que no contuviera falsedades ni engaños, *Bates*, *supra*, no podemos concluir que el querellado incurrió en conducta antiética por haber

tenido exposición en los medios noticiosos respondiendo al pedido de los periodistas.

No habiendo otro señalamiento contra el Lcdo. Troncoso en el presente caso, ordenamos el archivo de la querella presentada en lo que a éste respecta.

### D. Bufete Coale, Cooley & Lietz

Al bufete de referencia se le imputan dos cargos por violación a los cánones 34 y 36 de Ética Profesional, respectivamente. Ello en atención a una carta que dirigiesen a clientes potenciales relacionados con la explosión de Río Piedras, la cual el Procurador General entendió era engañosa, conducente a error y constitutiva de solicitación prohibida.

El bufete querellado presentó, con fecha de 29 de noviembre de 2000, una *Moción Dispositiva* en la cual, entre otras cosas, expresó que debido a la costumbre del bufete de adherirse a los cánones de ética profesional del Distrito de Columbia, percibieron que su conducta en los hechos ante nos estaban enmarcados dentro de los parámetros éticos de nuestra jurisdicción. Por ello, solicitaron que se tomara en cuenta ese hecho como atenuante en el presente caso. No tienen razón.

El Canon 34 de Ética Profesional prohíbe la solicitación personal, ya sea por el abogado personalmente o valiéndose de terceros. Como expresáramos antes, este Canon se inspira en la idea de que la contratación de representación legal debe darse de

forma libre, inteligente y voluntaria, sin que medien persuasiones o presiones directas e indebidas de parte del abogado o de sus representantes. Ese tipo de acercamiento constituye una intromisión con la intimidad de la persona, y presenta un problema para el juzgador que evalúa su pertinencia ya que, distinto a la comunicación escrita, es menos susceptible de ser verificada y probada. *Véase Franco Rivera y Masini Soler*, supra, a la pág. 832 y casos allí citados.

En el caso de marras, la carta preparada por Coale, Cooley & Lietz fue entregada personalmente, a nombre del bufete, por el señor Ted Dickinson y la señora Ricci Marcano. Tal acercamiento fue en ocasiones acompañado de flores y dulces. Siendo le entrega personal y directa, resolvemos que se enmarca dentro de la prohibición que propugna el Canon 34, y que no se ubica bajo la excepción de *Shapero*, *supra*. Ello así toda vez que ese tipo de contacto supone todos los peligros que pretende atender el Canon 34, y que han sido señalados por la Corte Suprema en sus decisiones pertinentes, a saber: 1) violentar la intimidad de la persona objeto del daño; 2) poner presión indebida sobre el cliente potencial, quien debe seleccionar a su abogado de manera libre, voluntaria e inteligente; y 3) la dificultad de verificar y probar la naturaleza **del acercamiento**.

Distinto a lo que el bufete querellado quiere representar, no estamos ante una caso a evaluarse al

amparo de *Shapero*, *supra*.  O sea, no se trata de una carta enviada por correo en la que nuestra función revisora se limita a evaluar el lenguaje de la comunicación, para determinar si la misma es engañosa o conducente a error.  *Véase Franco Rivera y Masini Soler*, *supra*.  Se trata, por el contrario, de un caso de solicitación personal.  En consecuencia, resolvemos que se violó el Canon 34, sin necesidad de entrar a considerar el lenguaje empleado en la carta.

Ello, no obstante, no debe interpretarse como que condonamos o aceptamos como veraz o apropiado el lenguaje utilizado en la carta de referencia.  Por el contrario, el lenguaje utilizado por el bufete en algunas secciones de la carta es engañoso y conducente a error.  Por ejemplo, al expresar que "muy pocos tienen el tiempo y los recursos financieros para llevar un caso como éste hasta sus últimas consecuencias," el bufete pudo crear en el recipiente de la misiva la idea de que el único modo de recibir compensación era llevando el caso hasta sus últimas consecuencias.  Es decir, la carta no le informa debidamente al cliente potencial que el caso también puede ser transigido extrajudicialmente.  Abona a esta conclusión la expresión a los efectos de que "[s]i bien muchos bufetes de los Estados Unidos y Puerto Rico participaron en el último desastre del tal magnitud (el incendio del Dupont Plaza), ***fuimos nosotros el único***

**bufete que en última instancia llevó el caso a juicio**"
(énfasis suplido).

Asimismo, la expresión de que el bufete es uno de los "más prestigiosos para casos de incendios y explosiones," y que "como tal est[án] en una posición privilegiada para poder proporcionarle una excelente representación legal, y la máxima compensación posible," nos resulta conducente a error, ya que crea unas expectativas irrazonables de éxito en el cliente potencial. Igualmente, nos resulta inapropiado el uso de expresiones auto-elogiosas y comparativas tan explícitas.

Por último, resolvemos que el hecho de que la única cliente que el bufete logró contratar se muestre satisfecha con la labor que se viene realizando a su favor, y de que no se haya probado algún otro daño, no es paliativo que exonere al bufete querellado. La Corte Suprema ha resuelto, y este Tribunal ha adoptado, la norma de que los cánones que prohíben la solicitación personal son unos de naturaleza profiláctica, que en nada dependen de probar la ocurrencia de algún daño específico. Véase *Ohralik v. Ohio State Bar Association*, *supra*, a la pág. 468; *Franco Rivera y Masini Soler*, *supra*, a la pág. 832. Por tanto, el enfoque del juzgador debe ser la conducta desplegada y no los efectos de la misma. *Id.*

Por los hechos que hemos encontrado probados corresponde la imposición de sanciones. Sin embargo, en

vista de las particularidades del presente caso, debemos indagar sobre nuestra facultad para disciplinar a Coale, Cooley & Lietz.  Veamos.

La presentación de la querella de marras en contra del bufete de referencia responde a que éste acudió a Puerto Rico a gestionar de manera impropia clientes potenciales relacionados con la explosión de Río Piedras. Es decir, a pesar de que Coale, Cooley & Lietz tiene su sede en el Distrito de Columbia, **es un hecho probado que dicho bufete optó por extender su práctica profesional a nuestra jurisdicción**.  Toda vez que este bufete está radicado en Washington, D.C., y que presumiblemente los abogados que lo componen tienen el grueso de su práctica profesional en esa jurisdicción, debemos abordar la autoridad que tenían éstos para practicar la abogacía en Puerto Rico y nuestra jurisdicción para imponerle sanciones.

Reiteradamente hemos expresado que este Tribunal tiene el poder inherente y exclusivo para admitir abogados a la práctica de la profesión. *In re Peña Peña*, *supra*; *In re Bosch*, 65 D.P.R. 248 (1945); *Ex parte Jiménez*, 55 D.P.R. 54 (1939).  En virtud de dicha autoridad, el Tribunal Supremo de Puerto Rico aprobó el Reglamento de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía, 4 L.P.R.A. Ap. VII-B, Reglas 1-18, (en adelante, "Reglamento de Aspirantes"), el cual estableció el esquema jurídico para reglamentar el

ejercicio de la abogacía en Puerto Rico. Con el propósito de proteger a la ciudadanía de personas no aptas para ejercicio de la profesión legal, el referido Reglamento instituyó los requisitos mínimos con los que debe cumplir todo aspirante a ejercer como abogado en el Estado Libre Asociado. Así, la Regla 4 del Reglamento de Aspirantes establece los siguientes requisitos para ser admitido a ejercer en nuestra jurisdicción: 1) ser mayor de veintiún (21) años de edad; 2) haber cursado estudios de Derecho, obtenido y aprobado el grado correspondiente al título de abogado en una escuela de Derecho aprobada por la *American Bar Association* o por el tribunal; 3) ser persona de buena reputación; 4) aprobar un examen de reválida general preparado, administrado y evaluado por la Junta; y 5) haber obtenido, antes de su admisión a una Escuela de Derecho, el grado universitario de bachillerato si son egresados de instituciones en los Estados Unidos o Puerto Rico.

Igualmente, el Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, R. 1-50, expone en su Regla 12 los requisitos para ejercer la abogacía en Puerto Rico. Además de la admisión mediante examen (Regla 12(a)), la Regla 12(e) de dicho Reglamento provee para la admisión por cortesía, disponiendo en su parte pertinente:

> [c]ualquier persona admitida al ejercicio de la abogacía en un estado o territorio de los Estados Unidos de América o en el Distrito de Columbia

podrá ser autorizada por cortesía por este tribunal para postular como abogado(a) en Puerto Rico en casos especiales.

La solicitud deberá ser endosada por un(a) abogado(a) admitido(a) al ejercicio de su profesión por este tribunal, quien dará fe de la capacidad de la persona solicitante para postular como abogado(a) en el caso correspondiente. Deberá unirse a la misma un certificado expedido por el más alto tribunal del estado en el cual la persona solicitante esté admitida al ejercicio de la profesión, haciendo constar el hecho de su admisión y que a la fecha del certificado se mantiene debidamente acreditado. Tanto la persona solicitante como el(la) abogado que endose su solicitud deberá hacer constar que la primera domina el español. De lo contrario, la autorización que expida este tribunal exigirá que la persona solicitante postule acompañada por un(a) abogado(a) del foro puertorriqueño que domine tanto el español como el inglés.

La Regla 12(f) del mismo Reglamento dispone otra manera de practicar la abogacía en Puerto Rico sin necesidad de tomar el examen de reválida: la admisión al ejercicio de la profesión por estudiantes de Derecho. Según la referida Regla, aquellos estudiantes matriculados en Escuelas de Derecho debidamente acreditadas, y que hayan—entre otras cosas— completado al menos dos terceras partes de los créditos requeridos para el grado de *Juris Doctor*, y que se desempeñe bajo la supervisión de un abogado admitido a ejercer la abogacía

por este Tribunal, podrán ejercer la abogacía ante los tribunales de Puerto Rico.[21]

La práctica de la abogacía fuera de las instancias antes descritas representa un acto ilegal constitutivo de delito menos grave. Sobre ese particular, la sección 7 de la Ley Núm. 17 de 10 de junio de 1939, según enmendada, 4 L.P.R.A. § 740, dispone lo siguiente:

> [n]inguna persona que no sea abogado autorizado por el Tribunal Supremo de Puerto Rico podrá dedicarse al ejercicio de la profesión de abogado, ***ni anunciarse como tal***, ni como agente judicial, ni gestionar, con excepción de asuntos propios, ningún asunto judicial o cuasi judicial ante cualquier tribunal judicial (énfasis suplido).[22]

Asimismo, el Canon 33 de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 33, impone al abogado la obligación de evitar la práctica de la abogacía y la notaría por individuos no autorizados. Dicho Canon también prohíbe que un abogado no admitido en nuestra jurisdicción suministre consejo legal a los clientes de un abogado ***aunque se trate de un asunto fuera de los tribunales***. Las prohibiciones estatuídas en las disposiciones precedentes se justifican, no como un medio para eliminar la competencia en la profesión legal, sino como un ejercicio del poder de razón de estado para la protección

---

[21] La Regla 12(f), 4 L.P.R.A. Ap. XXI-A, R. 12(f), enumera siete(7) requisitos para poder ejercer siendo estudiante de Derecho.

[22] *Véase además* el Artículo 12 de la Ley del Colegio de Abogados de Puerto Rico, 4 L.P.R.A. § 782.

del público de personas no cualificadas o no diestras. *Pueblo v. Santaella*, 91 D.P.R. 350 (1964).

En el caso de marras, tenemos la particular situación de que ningún abogado de Coale, Cooley & Lietz compareció como firmante en la carta que ofrecía los servicios del bufete a las víctimas de la explosión de Río Piedras. Además, las gestiones de entrega de la referida carta las llevaron a cabo dos individuos que no son abogados. Tampoco surge de los escritos y documentos que obran en autos la identidad de algún abogado de dicha firma legal. Por tanto, ante la incomparecencia de algún abogado del bufete querellado nos vemos imposibilitados de constatar si los miembros de dicha firma que estaban encargados del asunto de la explosión, ***y que autorizaron el curso de acción emprendido***, estaban admitidos a practicar el Derecho en Puerto Rico mediante alguna de las tres formas permitidas en nuestro ordenamiento. Adviértase que aunque el referido bufete no presentó ninguna demanda ante los tribunales del E.L.A., la práctica de la profesión, según definida en la citada sección 7 de la Ley Núm. 17, *supra*, no se limita a comparecer ante los tribunales, y se extiende a identificarse y representar ser abogado con el fin de agenciarse la representación legal de clientes potenciales.[23]

---

[23] A modo de referencia, la Comisión sobre Práctica

continúa...

---
²³ ...continuación
Multijurisdiccional de la American Bar Association recomendó enmendar la Regla Modelo 5.5 para que exprese, en lo pertinente, lo siguiente:

> **Rule 5.5: Unauthorized Practice of Law; Multijurisdictional Practice of Law**
>
> (a)  A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.
>
> (b)  A lawyer who is not admitted to practice in this jurisdiction shall not:
>
>> 1)  except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or
>>
>> 2)  ***hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction...***

El Comentario [9] a esta Regla dispone que:

> [l]awyers not admitted generally in a jurisdiction may be authorized by law or order of a tribunal or an administrative agency to appear before the tribunal or agency. This authority may be granted pursuant to formal rules governing admission *pro hac vice* or pursuant to informal practice of the tribunal or agency...***To the extent that a court rule or other law of this jurisdiction requires a lawyer who is not admitted to practice in this jurisdiction to obtain admission pro hac vice before appearing before a tribunal or administrative agency, this Rule requires the lawyer to obtain that authorit***y. *Véase* American Bar Association: Report of the Commission on Multijursdictional Practice, Report 201B, a las págs. 1-3 (August 2002) (énfasis suplido).

En consecuencia, se remite el asunto al Procurador General para que investigue cuáles abogados de Coale, Cooley & Lietz estaban a cargo del caso que nos ocupa, para así determinar si éstos estaban admitidos al ejercicio de la abogacía en Puerto Rico al momento en que ocurrieron los sucesos en controversia. Ello es importante para determinar no solo la posible práctica ilegal de la abogacía por parte de algunos de los miembros del bufete querellado—lo que implicaría responsabilidad profesional y penal— sino también para adjudicar responsabilidades por los cargos imputados en la presente querella, los cuales encontramos probados en los párrafos anteriores.

Finalmente, dado que no hay prueba en autos que refleje que el bufete querellado se anunciase en los medios, ordenamos el archivo del cargo por violación al Canon 36 de Ética Profesional.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

| | | |
|---|---|---|
| Luis E. Gervitz Carbonell | CP-1998-16 | Conducta |
| Jorge Izquierdo San Miguel | | Profesional |
| José G. Izquierdo Stella | | |
| Francisco Troncoso | | |
| Bufete Coale, Cooley & Lietz | | |

SENTENCIA

San Juan, Puerto Rico, a 28 de julio de 2004.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, censuramos enérgicamente al Lcdo. Luis E. Gervitz Carbonell, apercibiéndolo de que futuras violaciones a los deberes éticos de la profesión acarrearán sanciones más severas.

En cuanto al Lcdo. José G. Izquierdo Stella, lo suspendemos por un período de tres (3) meses del ejercicio de la abogacía y la notaría. Al Lcdo. Izquierdo San Miguel lo suspendemos por un período de treinta (30) días del ejercicio de la abogacía y la notaría. Le imponemos a éstos el deber de notificar a todos sus clientes de su presente inhabilidad de continuar representándolos durante el período de la suspensión. Además, deberán devolver cualesquiera honorarios recibidos por trabajos no realizados, e informar oportunamente de su suspensión a los foros judiciales y administrativos del país. El Alguacil del Tribunal Supremo procederá a incautarse de la obra y sello notarial del Lcdo. Izquierdo Stella, debiendo entregar los mismos a la Oficina de Inspección de Notarías para el correspondiente examen e Informe a este Tribunal.

Con relación al Lcdo. Francisco Troncoso, ordenamos el archivo de la querella presentada en lo que a éste respecta.

En cuanto al bufete Coale, Cooley & Lietz, se remite el asunto al Procurador General para que investigue cuáles abogados de dicha firma legal estaban a cargo del caso que nos ocupa, para así determinar si éstos estaban admitidos al ejercicio de la abogacía en Puerto Rico al momento en que ocurrieron los sucesos en controversia. Finalmente, dado que no hay prueba en autos que refleje que el bufete querellado se anunciase en los medios, ordenamos el archivo del cargo por violación al Canon 36 de Ética Profesional.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Presidenta señora Naveira Merly no interviene. Los Jueces Asociados señores Rebollo López y Fuster Berlingeri no intervinieron.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo